MARC J. FAGEL (Cal. Bar No. 154425)
ROBERT L. MITCHELL (Cal. Bar No.161354)
  MitchellR@sec.gov
KAREN KREUZKAMP (Cal. Bar No. 246151)
  KreuzkampK@sec.gov

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
44 Montgomery Street, Suite 2800
San Francisco, California 94104
Telephone:  (415) 705-2500
Facsimile:  (415) 705-2501

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>        Plaintiff,<br><br>    v.<br><br>JAMES MICHAEL MURRAY,<br><br>        Defendant,<br><br>    and<br><br>EVENT TRADING GP, LLC,<br><br>        Relief Defendant. | Case No. 12-cv-1288-EMC<br><br>**SUPPLEMENTAL FIRST AMENDED COMPLAINT** |

Plaintiff Securities and Exchange Commission (the "Commission") alleges:

## SUMMARY OF THE ACTION

1.  James Michael Murray, a Marin County investment adviser, defrauded potential and actual investors of Market Neutral Trading, LLC, an investment fund he controlled, by providing

them grossly inflated representations of the fund's historical performance and phony audit reports issued by a fictitious audit firm. The financial statements attached to the phony audit reports materially misstated the financial condition and performance of the fund, as well as the amount of assets it had.

2. By engaging in the acts alleged in this Complaint, Murray violated the antifraud provisions of the federal securities laws and a Commission rule prohibiting fraud by investment advisers on investors in a pooled investment vehicle. The Commission seeks an order enjoining Murray from future violations of the securities laws and requiring him to disgorge ill-gotten gains with prejudgment interest and pay civil monetary penalties. The Commission also seeks an order requiring relief defendant Event Trading GP, LLC to disgorge ill-gotten gains with prejudgment interest.

## JURISDICTION, VENUE, AND INTRADISTRICT ASSIGMENT

3. The Commission brings this action under Sections 20(b) and 20(d) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b) and 77t(d)], Section 21(d) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d)], and Section 209(d) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. § 80b-9(d)].

4. This Court has jurisdiction over this action under Sections 20(b) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b) and 77v(a)], Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa], and Sections 209 and 214 of the Advisers Act [15 U.S.C. §§ 80b-9 and 80b-14].

5. Venue in this District is proper under Section 22(a) of the Securities Act [15 U.S.C. § 77v], Section 27 of the Exchange Act [15 U.S.C. § 78aa], and Section 214 of the Advisers Act [15 U.S.C. § 80b-14] because defendant Murray resides in the Northern District of California.

6. Assignment to the San Francisco Division is appropriate pursuant to Civil Local Rules 3-2(c) and 3-2(d) because acts and omissions giving rise to the Commission's claims occurred, among other places, in San Francisco and Marin Counties.

**DEFENDANT**

7.     **James Michael Murray,** age 43, currently resides at The Glenn E. Dyer Detention Facility in Oakland, California.  He is a former resident of Larkspur, California.  Since 2006, has served as sole member and investment adviser of Market Neutral Trading, LLC.  He formerly worked for at least three large brokerage firms.  Murray has held Series 7, 63, and 65 securities licenses issued by the Financial Industry Regulatory Authority, or, its predecessor, the National Association of Securities Dealers.

**RELIEF DEFENDANT**

8.     **Event Trading GP, LLC** ("Event Trading") represents in its operating agreement that it is a California limited liability company.  The California Secretary of State website reports that Event Trading is a Delaware limited liability company registered to do business in California; the Delaware Secretary of State website indicates that Event Trading is a limited partnership.  Event Trading is owner of a brokerage account in which proceeds from trades made on behalf of MNT Master Fund Ltd. were placed.  The account currently holds more than $350,000.

**OTHER RELEVANT ENTITIES**

9.     **Market Neutral Trading, LLC** ("MNT" or the "Fund") is a Delaware limited liability company with its principal place of business in San Francisco, California.  Its sole member and investment adviser is James Murray, who has ultimate control over all trading decisions for the Fund.  Since at least August 2008, MNT has operated as a fund that purported to invest in securities.

10.    **MNT Master Fund Ltd.** is a company incorporated in the Cayman Islands on June 2, 2011 formed for the purpose of serving as the master fund in a master-feeder fund structure aimed at investing in and trading securities, financial instructions, and other assets.  The investment manager of MNT Master Fund Ltd. is MNT GP, LLC, a Delaware limited liability company.  According to the private placement memorandum for MNT Master Fund Ltd., Murray is the managing member of MNT GP, LLC, controls all of its operations and activities, and has discretionary investment authority over MNT Master Fund Ltd. assets.

11.     **Jones, Moore & Associates Ltd.** ("JMA") is a Delaware corporation with a purported principal place of business is in Wilmington, Delaware. It purports to provide audit and accounting services.

## FACTUAL ALLEGATIONS

**A.     Murray Formed MNT and, Through MNT and Other Related Entities, Raised Approximately $5 Million.**

12.     According to some of its marketing materials, MNT purports to be a hedge fund that employs "a series of proprietary models and utilizes a broad cross-section of investment styles to identify investment opportunities," investing primarily in domestic equities.

13.     Murray is the sole member of MNT. He is also the Fund's investment adviser, managing all of the Fund's assets and making all investment decisions for the Fund. According to various private placement memoranda Murray provided investors, he received either 20% or 25% of any profit realized by the Fund for his services.

14.     From approximately July 29, 2008 and December 16, 2008, Murray, on behalf of MNT, raised approximately $2 million from three investors.

15.     From approximately January 26, 2011 through February 27, 2012, Murray, on behalf of MNT, raised approximately $3 million from at least eight investors. Murray deposited the money he raised in 2011 and 2012 into bank and brokerage accounts held in the names of the following entities: MNT; Market Neutral Trading B, LLC; MNT GP, LLC; and MNT Master Fund Ltd. Murray controls each of these entities.

**B.     In 2009, Murray Defrauded Existing Investors When He Gave Them A Bogus Audit Report from a Fictitious Audit Firm.**

16.     In 2009, MNT investors received what purported to be an independent auditor's report of MNT's financial statements from the firm of Jones, Moore & Associates Ltd., entitled "Market Neutral Trading, LLC Financial Statements and Independent Auditors' Report," dated December 31, 2008 ("JMA 2008 Audit Report"). One investor received the report on or about May 27, 2009, and another investor received it on or about June 9, 2009.

17. According to the JMA 2008 Audit Report, JMA conducted an audit of MNT's financial statements for the period ended December 31, 2008 in accordance with Generally Accepted Auditing Standards. In the report, JMA opined that MNT's financial statements conformed with Generally Accepted Accounting Principles ("GAAP").

18. The JMA 2008 Audit Report was false and misleading in several respects.

19. First, it falsely conveyed that a GAAP audit of MNT's financial statements was conducted by a legitimate, third-party accounting firm. Far from being a legitimate accounting firm, JMA is merely a Murray-controlled shell company, as is demonstrated by at least the following:

(a) JMA purports to operate in the State of Delaware, but it is not registered or licensed by Delaware as an accounting firm. Accounting and auditing firms doing business out of Delaware are required to register with the state.

(b) JMA's website lists twelve professionals with specific educational degrees and licenses who supposedly work for JMA, but at least five of these professionals do not exist. Among the fictitious professionals listed are Richard Jones and Joseph Moore, the two named principals of JMA.

(c) Murray attempted to open brokerage accounts in the name of JMA. He identified himself as Chief Financial Officer of JMA on various account documents provided to brokerage firms. Murray also called brokerage firms, falsely claiming to be the principal identified on most JMA documents.

(d) Murray's personal brokerage accounts, MNT's brokerage accounts, and JMA's brokerage accounts were accessed from the same computers.

(e) A Murray-controlled entity paid for the "jonesmoore.com" domain name and website.

20. Second, the JMA 2008 Audit Report distributed to MNT investors falsely conveyed the financial condition of MNT. The financial statements attached to the audit report understated the costs of MNT's investments and thus overstated the Fund's investment gains by approximately 90%.

1 In addition, they overstated MNT's income by approximately 35%, member capital by approximately
2 18%, and total assets by approximately 10%.

3   21.   The misrepresentations in the JMA 2008 Audit Report were material.

4   22.   At the time MNT caused the JMA 2008 Audit Report to be distributed to its investors,
5 Murray knew or should have known that the report was materially false and misleading.

**C. In 2011, Murray Defrauded Potential Investors by Distributing to Them Bogus Audit Reports and Lying to Them about MNT's Historical Performance.**

8   23.   By the end of 2009, Murray had lost almost all of the money he had raised on behalf
9 of MNT.

10  24.   By at least January 2011, Murray revived MNT and began soliciting new investors.
11 From approximately January 2011 through February 2012, Murray raised approximately $3,000,000
12 from new investors.

13  25.   Murray engaged a consultant to assist him in soliciting new investors. He provided
14 the consultant information regarding MNT, including information regarding the Fund's historical
15 performance.

16  26.   Based on the information received from Murray, the consultant created a PowerPoint
17 presentation to solicit investors for MNT. The PowerPoint presentation had "MNT" on the cover and
18 in the footer and listed Murray as MNT's "Founder and CIO." Murray approved the PowerPoint
19 presentation the consultant prepared before it was provided to any potential investors.

20  27.   In 2011, the consultant sent potential investors information and documents regarding
21 MNT, including documents purporting to be audit reports issued by JMA, with attached financial
22 statements, and a PowerPoint presentation that included Murray's representations of the Fund's
23 historical performance. Investors relied on these documents and the information contained in them
24 when making their decisions to invest. Information in these documents was false.

25  28.   First, the financial statements indicated that they were audited by the same fictitious
26 firm (JMA) as the JMA 2008 Audit Report Murray distributed to investors in 2009. Because JMA is
27 a fictitious firm, the claim that JMA had audited MNT's financial statements was false.

28

29. Second, the JMA audit reports and attached financial statements Murray distributed in 2011 grossly overstated the amount of assets MNT had, as well as MNT's performance returns. For example, a document entitled "Market Neutral Trading, LLC Financial Statements and Independent Auditors' Report," dated December 31, 2009, and received by at least one potential investor, shows MNT having more than $12 million in assets. In reality, MNT had less than $2 million in 2009. A document entitled "Market Neutral Trading, LLC Financial Statements and Independent Auditors' Report," dated December 31, 2008, which Murray distributed in 2011, reported assets of almost $11 million. MNT actually had less than $2 million in 2008. This $11 million figure is also at odds with the JMA 2008 Audit Report Murray distributed to investors in 2009, which claimed $2.4 million in assets.

30. Murray's representations as to MNT's historical performance, both in the audit reports and the PowerPoint presentation distributed to potential investors, are materially false. For example, in the document entitled "Market Neutral Trading, LLC Financial Statements and Independent Auditors' Report," dated December 31, 2009, Murray represented to potential investors that MNT had a 12.5% return on investment in 2009. Similarly, in the PowerPoint Presentation, Murray represented that MNT had a 13.4% return on investment in 2009. Both are false. Analysis of brokerage records from 2009 shows that the fund's return on investment was approximately negative (-) 88%.

31. Murray also misrepresented results for 2010. In the document entitled "Market Neutral Trading, LLC Financial Statements and Independent Auditors' Report," dated December 31, 2010, Murray represented to potential investors that MNT had a 24.97% return on investment in 2010. In the PowerPoint Presentation, he represented that MNT had a 26.1% return on investment in 2010. However, Murray did not engage in any substantial trading that year, and the limited trading in which he did engage had an approximate annualized return of negative (-) 505%.

**D. Murray Has Continued to Act on Behalf of MNT Master Fund Ltd. and Proceeds Generated from this Activity Belong to Investors, Not Murray.**

32. In or about February 2012, Murray began sending Oppenheimer & Co. ("Oppenheimer") documents to open an account in the name of MNT Master Fund Ltd. Oppenheimer's compliance department cleared the account for opening in or about June 2012.

33. In opening the account at Oppenheimer in the name of MNT Master Fund Ltd., Murray bound the entity for transactions made in the account.

34. On or about July 27, 2012, Murray, using the Oppenheimer account held in the name of MNT Master Fund Ltd., shorted 50,000 shares of Netflix, Inc. stock. In a short sale, an investor agrees to sell a certain number of shares of stock to a counterparty by some future date at an agreed price, even though the investor does not currently own the stock. The investor profits if the price of the stock declines below the agreed price. Then the investor can purchase the stock on the open market at the lower price and complete the transaction by selling the stock to his counterparty at the higher, agreed price.

35. MNT Master Fund Ltd. realized a gain of more than $410,000 from this short sale transaction. Oppenheimer deposited the proceeds into the MNT Master Fund Ltd. account. The gain belonged to the fund, *i.e.*, the investors from whom Murray raised money in 2011 and 2012 for MNT and whose money Murray moved to Market Neutral Trading B, LLC and then to MNT Master Fund Ltd.

36. Despite the fact that the funds in the Oppenheimer account belonged to investors and not to Murray, on or about August 9, 2012, Murray wired $150,000 to his personal criminal lawyer and the balance, approximately $260,000, to an account at Interactive Brokers, ending in 0538. That account is held in the name of Event Trading.

37. The Interactive Brokers account in the name of Event Trading was opened in or around July 2012.

38. Murray controls Event Trading. Though his name is not listed on the account, the physical address and email address for Event Trading are known addresses used by Murray. The operating agreement Event Trading provided to Interactive Brokers appears to be the same as that

1  used by Murray and MNT and Market Neutral Trading B, LLC, with the exception of the name of the
2  entity, name of the manager, and effective date of the agreement.  Murray also made telephone calls
3  to Interactive Brokers, representing that he was one of the owners of Event Trading.

### FIRST CLAIM FOR RELIEF
### Violations of Section 17(a) of the Securities Act

6  39.  The Commission realleges and incorporates by reference paragraphs 1 through 38.

7  40.  Murray has, by engaging in the conduct set forth above, directly or indirectly, in the offer or sale of securities, by the use of means or instruments of transportation or communication in interstate commerce, or of the mails:  (a) with scienter, employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchasers of such securities.

15  41.  By reason of the foregoing, Murray has directly or indirectly violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], and unless restrained and enjoined will continue to violate this provision.

### SECOND CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5

20  42.  The Commission realleges and incorporates by reference paragraphs 1 through 38.

21  43.  By engaging in the conduct described above, Murray, directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or of the mails, with scienter:

24  (a) employed devices, schemes, or artifices to defraud;

25  (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

9

SUPPLEMENTAL FIRST AMENDED COMPLAINT
SEC v. MURRAY
CASE NO. 12-CV-1288 EMC

1        (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers and sellers of securities.

3    44.   By reason of the foregoing, Murray has directly or indirectly violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder [15 U.S.C. § 78j(b) and 17 C.F.R. §§ 240.10b-5] and unless restrained and enjoined will continue to violate these provisions.

### THIRD CLAIM FOR RELIEF
**Violations of Advisers Act Section 206(4) and Rule 206(4)-8**

45.   The Commission realleges and incorporates by reference paragraphs 1 through 38.

46.   By engaging in the acts and conduct alleged above, Murray directly or indirectly, through use of the means or instruments of transportation or communication in interstate commerce or of the mails, and while engaged in the business of advising others for compensation as to the advisability of investing in, purchasing, or selling securities:  (a) made untrue statements of a material fact or omitted to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading, to investors or prospective investors in a pooled investment vehicle; and (b) engaged in acts, practices, or courses of business that were fraudulent, deceptive, or manipulative with respect to investors or prospective investors in a pooled investment vehicle.

47.   By reason of the foregoing, Murray has violated and, unless restrained and enjoined, will continue to violate Section 206(4) of the Advisers Act and Rule 206(4)-8 thereunder [15 U.S.C. § 80b-6(4) and 17 C.F.R. § 275.206(4)-8].

### PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court:

I.

Permanently enjoin James Murray from directly or indirectly violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act and Rule 10b-5 thereunder [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5], and Section 206(4) of the Advisers Act and Rule 206(4)-8 thereunder [15 U.S.C. § 80b-6(4) and 17 C.F.R. § 275.206(4)-8];

II.

Order James Murray and relief defendant Event Trading GP, LLC to disgorge any wrongfully obtained benefits, including prejudgment interest;

III.

Order James Murray to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], and Section 209 of the Advisers Act [15 U.S.C. § 80b-9];

IV.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court; and

V.

Grant such other and further relief as this Court may determine to be just and necessary.

DATED:  January 9, 2013             Respectfully Submitted,

*/s/  Robert L. Mitchell*
Robert L. Mitchell
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION