United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> JAMES MICHAEL MURRAY, et al., <br><br> Defendants. | Case No.  12-cv-01288-EMC <br><br> **ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** <br><br> Docket No. 122 |

## I.   INTRODUCTION

On March 15, 2012, the Securities and Exchange Commission (the Commission) brought this lawsuit against Defendant James Michael Murray, alleging that Murray violated Section 17(a) of the Securities Act of 1933, Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder, and Section 206(4) of the Investment Advisers Act of 1940 and Rule 206(4)-8 thereunder.  Docket No. 1 (Complaint); Docket No 63 (Supplemental First Amended Complaint). Specifically, the Commission alleged that Murray defrauded investors in Market Neutral Trading, LLC (MNT), an investment fund he controlled, by providing them inflated representations of the fund's historical performance and phony audit reports issued by a fictitious audit firm.  Docket No. 63 at ¶¶ 1, 16-31.  On April 19, 2012 the Grand Jury returned an indictment against Murray, charging him of wire fraud, money laundering, identity theft, and criminal contempt.  *See* Docket No. 123, Ex. C (Indictment).  Because the criminal case was based on the same set of allegations as the instant case, the Court related the criminal charges with the Commission's civil action.  *See* Docket No. 123, Ex. E (Order).  Subsequently, the jury reached a unanimous verdict finding Defendant guilty on all counts.  Docket No. 125, Ex. U.  On April 6, 2016, the Court sentenced

**United States District Court**
For the Northern District of California

1   Murray to a term of 180 months in custody and ordered Murray to pay restitution in the amount of

2   $3,480,479.90.  Docket No. 125, Ex. V.  The Court entered judgment on April 8, 2016.  Docket

3   No. 125, Ex. W.

4       Currently pending before the Court is Plaintiff's motion for summary judgment.  Docket

5   No. 122.  The Commission argues that it is entitled to summary judgment based on the doctrine of

6   collateral estoppel because the facts elicited at Defendant's criminal trial are virtually identical to

7   the conduct that gives rise to the violations alleged by the Commission in this case.  In the motion,

8   the Commission also seeks relief against Murray.

9                           **II.   DISCUSSION**

10  A.    Summary Judgment Based on Collateral Estoppel

11      1.    Legal Standard

12      Under Federal Rule of Civil Procedure 56(c), summary judgment shall be rendered "if the

13  pleadings, depositions, answers to interrogatories, and admissions on file, together with the

14  affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

15  party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  An issue of fact is genuine

16  only if there exists sufficient evidence for a reasonable jury to find for the nonmoving party.  *See*

17  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248-49 (1986).  At the summary judgment stage,

18  courts must view the evidence in the light most favorable to the nonmoving party, and all

19  justifiable inferences are to be drawn in the nonmovant's favor.  *See id.* at 255.

20      A plaintiff may prevail on a motion for summary judgment only if it affirmatively

21  demonstrates that there is no genuine dispute as to every essential element of its claim.  *See River*

22  *City Mkts., Inc. v. Fleming Foods W., Inc.,* 960 F.2d 1458, 1462 (9th Cir.1992).  Once the plaintiff

23  satisfies the initial burden of showing no genuine dispute, the burden shifts to the opposing party

24  to demonstrate that there is a genuine dispute of material fact.  *Celotex Corp. v. Catrett*, 477 U.S.

25  317, 323 (1986).  The defendant must submit "significant probative evidence tending to support"

26  their allegations, rather than making conclusory allegations.  *Anderson v. Liberty Lobby, Inc.*, 477

27  U.S. 242, 249 (1986).

28      Plaintiff moved for summary judgment, arguing that "because the doctrine of collateral

United States District Court
For the Northern District of California

estoppel precludes Murray from contesting the facts founds at the criminal trial that led to his conviction, which are also the factual basis of the SEC's Complaint, there can be no genuine issue of material fact for trial."  Docket No. 122 at 9.

The doctrine of collateral estoppel forecloses a party who received a full and fair opportunity from litigating an issue it previously litigated unsuccessfully in an action.  *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 332-33 (1979).  Thus, "once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits."  *Montana v. United States*, 440 U.S. 147, 153 (1979).

A prior criminal conviction may work as an estoppel in favor of the government in a subsequent civil proceeding.  *Emich Motors Corp. v. Gen. Motors Corp.*, 340 U.S. 558, 568-69 (1951); *see Hinkle Nw., Inc. v. SEC*, 641 F.2d 1304, 1308-09 (9th  Cir. 1981).  In the Ninth Circuit, collateral estoppel based on a criminal conviction applies where: (1) the prior conviction was for a serious offense so that the defendant was motivated to fully litigate the charges; (2) there was a full and fair trial; (3) the issue on which the prior conviction is offered was of necessity decided at the criminal trial; and (4) the party against whom the collateral estoppel is asserted was a party at the prior trial.  *United States v. Real Prop. Located at Section 18*, 976 F.2d 515, 518 (9th Cir. 1992).

Murray's prior conviction was for serious offenses because: first, Murray was motivated to fully litigate the charges; and, second, Murray was eventually sentenced a term of 180 months in custody and ordered to pay $3,480,479.90 in restitution, Docket No. 125, Ex. V.  Further, the criminal trial to which Murray was a party was fair.  Murray was vigorously represented by experienced counsel.  *See* Docket No. 123, Ex F.

The question is whether the factual and legal issues for which collateral estoppel is sought here were actually and necessarily decided at the criminal trial.  In making such determination, the Court must examine the record, "including the pleadings, the evidence submitted, the instructions under which the jury arrived at its verdict, and any opinions of the courts," *Emich Motors Corp. v. Gen. Motors Corp.*, 340 U.S. 558, 569 (1951) (citation omitted), and inquire "whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to

**United States District Court**
For the Northern District of California

foreclose from consideration," *Ashe v. Swenson*, 397 U.S. 436, 444 (1970) (internal quotation omitted); *U.S. v. Romeo*, 114 F.3d 141, 143 (9th Cir. 1997) (concluding that the issue of knowledge was necessarily decided in the first trial because a rational jury could not have acquitted the defendant if it found that the defendant knowingly possessed marijuana).

        2.       Securities Act and Exchange Act claims

The Commission argues that its Securities Act and Exchange Act claims are based on the same facts decided in the government's favor at the criminal trial. Docket No. 122 (Plaintiff's motion for summary judgment) at 12-15.

Section 17(a) of the Securities Act provides:

> It shall be unlawful for any person in the offer or sale of any securities (including security-based swaps) or any security-based swap agreement (as defined in section 78c(a)(78) of this title) by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly
>
> > (**1**) to employ any device, scheme, or artifice to defraud, or
>
> > (**2**) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
>
> > (**3**) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a).

Section 10(b) of the Exchange Act provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange--
>
> > (**b**) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement¹ any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j.

Rule 10(b)(5) provides:

4

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a)    To employ any device, scheme, or artifice to defraud,

(b)    To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c)    To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. §§ 240.10b-5

Elements of these two statues (and implementing rules) are similar. Both require that the defendant: (1) engage in fraudulent conduct; (2) in connection with the offer, purchase, or sale of securities; (3) by means of interstate commerce; and (4) with scienter. *See SEC v. Phan*, 500 F.3d 895, 907-08 (9th Cir. 2007) ("Section 17(a) of the 1933 Act, Section 10(b) of the 1934 Act, and Rule 10b–5 'forbid making [1] a material misstatement or omission [2] in connection with the offer or sale of a security [3] by means of interstate commerce. . . . Violations of Section 17(a)(1), Section 10(b) and Rule 10b–5 require *scienter*. . . . Violations of Sections 17(a)(2) and (3) require a showing of negligence.'" (citation omitted)).  By establishing these elements, the Commission can satisfy its burden of showing no genuine dispute.

In the case at bar, each of the elements of the Securities Act and Exchange Act was necessarily decided in the Commission's favor at the criminal trial.

First, the jury necessarily found that Murray engaged in fraudulent conduct.  In the criminal case, the grand jury indicted Murray for wire fraud.  3:12-cr-00278-EMC, Docket No. 203.  The criminal statute under which Murray was indicted is 18 U.S.C. § 1343, which provides

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

United States District Court
For the Northern District of California

5

United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The Ninth Circuit has clarified the three elements of wire fraud as: "(1) the existence of a scheme to defraud; (2) the use of wire, radio, or television to further the scheme; and (3) a specific intent to defraud." *U.S. v. Jinian*, 725 F.3d 954, 960 (9th Cir. 2013) (citing *U.S. v. Pelisamen*, 641 F.3d 399, 409 (9th Cir. 2011)).  Regarding the first element of wire fraud, the Supreme Court held that "materiality of falsehood is an element of the federal . . . wire fraud." *Neder v. United States*, 527 U.S. 1, 25 (1999).

The Court instructed the jury that in order for Murray to be found guilty of wire fraud, the government must prove beyond a reasonable doubt that Murray "knowingly participated in, devised or intended to devise a scheme or plan to *defraud*, or a scheme or plan for obtaining money or property by means of *false or fraudulent* pretenses, representations, or promises," R.T. at 1778-79 (emphasis added), and the jury returned a verdict finding Murray guilty of wire fraud, Docket No. 125, Ex. T.  The jury also found that Murray's fraud was material to investors. *See* R.T. at 1778-79 (instructing jury that in order for Murray to be found guilty of wire fraud, the government must prove beyond a reasonable doubt that "the statement made or facts omitted as part of the scheme were material").

Second, the jury necessarily found that Murray's fraudulent conduct was made in connection with the offer, purchase, or sale of securities.  The Court instructed the jury that in order for Murray to be found guilty of wire fraud, the government must prove beyond a reasonable doubt that Murray "knowingly participated in, devised or intended to devise a scheme or plan to defraud, or a scheme or plan for obtaining money or property *by means of* false or fraudulent pretenses, representations, or promises," R.T. at 1778-79 (emphasis added), and the jury returned a verdict finding Murray guilty of wire fraud, Docket No. 125, Ex. T.

Murray's "scheme or plan for obtaining money" involved the offering and sales of securities by Murray.  Murray's criminal indictment identifies MNT as a "hedge fund" and defines "[t]he scheme to defraud" against MNT investors as Murray's defrauding of "victim investors in MNT by soliciting them with materially false information including false audit reports about MNT's historical performance that were supposedly prepared by JMA when, in fact, as MURRAY well knew, JMA was not an auditing firm and conducted no audits of MNT."  Case 3:12-cr-

00278-EMC, Docket No. 203 at ¶¶ 5, 11.  Thus, the jury must have understood Murray's scheme to defraud to have occurred in connection with investments in the fund.  Agreements by MNT investors to invest in the fund constitute securities under the federal securities laws.  *See* 15 U.S.C. § 77 b(a)(1) (defining "security" under the Securities Act to include "investment contracts"); 15 U.S.C. § 78c(a)(10) (defining "security" under the Exchange Act to include "investment contract"); 15 U.S.C. § 80b-2(18) (defining "[s]ecurity" under the Advisers Act to include participation in investment contract).  The jury could not have convicted Murray on the basis of a fraudulent scheme in connection with anything but securities.

Murray argues that the Commission failed to show that the scheme was in connection with the offer, purchase, or sale of securities because Murray did not receive any money or property in the form of incentive or management fees.  Docket No. 132 (Defendant's response) at 6.  Murray's argument fails as a matter of law.  Contrary to Murray's interpretation of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act, the Commission is not always required to show, and the Court is not always required to find, that the defendant received money or property through the alleged misrepresentations.  Only Section 17(a)(2) of the Securities Act requires such showing. 15 U.S.C. § 77q(a)(2); *see Vernazza v. SEC*, 327 F.3d 851, 858 (9th Cir. 2003).  Thus, even without such showing, the Court Murray may be held liable under Section 17(a)(1) and/or (3), as well as Section 10(b) of the Exchange Act and Rule 10(b)(5).

Third, Parties stipulated in advance of trial that each of the wire fraud counts "involved a wire communication, such as the transmission of an electronic signal or a wire transfer of funds between banks, and that each of these wire communications involved a communication between one state and another state, and therefore each constitutes a wire in interstate or foreign commerce."  Docket No. 125, Ex. S.

Finally, the jury necessarily found that Murray acted with scienter.  The Court instructed the jury that in order for Murray to be found guilty of wire fraud, the government must prove beyond a reasonable doubt that Murray acted with an "intent to defraud," defined as "an intent to deceive or cheat," R.T. at 1778-79, and the jury returned a verdict finding Murray guilty of wire fraud, Docket No. 125, Ex. T.  While violations of Sections 17(a)(2) and (3) of the Securities Act

United States District Court
For the Northern District of California

1    only require a finding of negligence, *SEC v. Phan*, 500 F.3d 895, 908 (9th Cir. 2007), this

2    requirement is satisfied by jury's finding of an intent to defraud.

3         Thus, the Commission's Securities Act and Exchange Act claims are based on the same

4    facts decided against Murray at the criminal trial.

5         3.    Advisers Act Claim

6         The Commission argues that its claim under Section 206(4) of the Advisers Act is based on

7    the same facts decided in the government's favor at the criminal trial.  Docket No. 122 (Plaintiff's

8    motion for summary judgment) at 15-17.

9         Section 206(4) of the Advisers Act provides:

10            It shall be unlawful for any investment adviser, by use of the mails
              or any means or instrumentality of interstate commerce, directly or
11            indirectly--

12            (**4**)    to engage in any act, practice, or course of business which is
              fraudulent, deceptive, or manipulative.
13

14   15 U.S.C. § 80b-6(4).

15        Rule 206(4)-8(a) prohibits "any investment adviser to a pooled investment vehicle" to:

16            (1)    Make any untrue statement of a material fact or to omit to
              state a material fact necessary to make the statements made, in the
17            light of the circumstances under which they were made, not
              misleading, to any investor or prospective investor in the pooled
18            investment vehicle; or

19            (2)    Otherwise engage in any act, practice, or course of business
              that is fraudulent, deceptive, or manipulative with respect to any
20            investor or prospective investor in the pooled investment vehicle.

21   17 C.F.R. § 275.206(4)-8(a).

22        As noted above, the elements of fraud were necessarily found in the criminal trial.

23   However, to hold Murray liable under Section 206(4), the Court must find that Murray is "an

24   investment adviser," *Vernazza v. S.E.C.*, 327 F.3d 851, 858 (9th Cir.), *amended*, 335 F.3d 1096

25   (9th Cir. 2003) ("Advisers Act § 206 prohibits advisers from, directly or indirectly, employing a

26   scheme to defraud clients or engaging in practices which operate as a fraud upon clients."), to a

27   "pooled investment vehicle.," *S.E.C. v. ABS Manager, LLC*, No. 13CV319-GPC BGS, 2014 WL

28   2605476, at *15 (S.D. Cal. 2014) ("Section 206(4) and Rule 275.206(4)–8 prohibit the same

1    conduct but as it relates to pooled investment vehicles.").

2         Here, Murray did not dispute in his response brief and admitted during the hearing on

3    November 3, 2016 that MNT is a pooled investment vehicle.  What is at issue is whether the jury

4    necessarily found that Murray is an investment adviser.  The jury did find so. As discussed above,

5    the jury necessarily found that Murray engaged in a scheme to defraud. The indictment defines

6    "[t]he scheme to defraud" as the one Murray engaged in "in his role as the sole investment advisor

7    for MNT."  Case 3:12-cr-00278-EMC, Docket No. 203 ¶ 11.  Similarly, ¶ 5 of the indictment

8    introduces "MNT's sole member and investment advisor" as Murray.  *Id.* at ¶ 5.  Nothing in the

9    indictment or evidence indicates that there was anyone other than Murray who advised the MNT.

10        Nor was there any evidence at trial that anyone other than Murray controlled investments

11   by the fund.  Trial exhibits admitted at the criminal trial show that Murray provided advice to the

12   fund, for compensation, and made investment decisions on behalf of MNT.  *See* Exhibit 160

13   (Docket No. 124, Ex. J) at 4 (MNT's manager questionnaire describing the management fees of

14   two percent and incentive fees of twenty percent); Exhibit 141 (Docket No. 124, Ex. K) (journal

15   entries for MNT, pool trial balance for January 2009, and incentive fee that list the accrued

16   incentive fees of $38,030.42); Exhibit 169 (Docket No. 123, Ex. N) (investor questionnaire signed

17   by Murray showing the two-percent management fee and twenty-percent incentive fee).

18        At least several other courts have similarly found violations of the Advisers Act based on

19   the defendants' convictions of wire fraud in the related criminal cases.  *See SEC v. Cook*, 2016

20   WL 128132, at *2 (finding that collateral estoppel applies and the SEC is entitled to summary

21   judgment as to the Advisers Act claim because the defendants' convictions of the wire and mail

22   fraud counts in the criminal case satisfy all of the requirements on the Advisers Act claim); *SEC v.*

23   *Desai*, 145 F. Supp. 3d 329, 336 (D.N.J. 2015) (granting summary judgment as to the defendant's

24   liability under the Advisers Act because the fraudulent conduct that formed the basis of the

25   defendant's guilty plea to wire fraud in the parallel criminal action established violations of the

26   Advisers Act); *SEC v. C.J.'s Financial*, 2012 WL 3600239, at *5-6 (E.D. Mich. 2012) (finding

27   that Defendant Campbell's plea agreement for wire fraud establishes the necessary elements for

28   the Advisers Act claim, including Campbell's qualification as an investment adviser, because the

**United States District Court**
For the Northern District of California

1  plea agreement indicates that Campbell owned and controlled the defendant financial services

2  company and because the company provided investment services).

3       Murray argues that he does not meet the statutory requirement of an "investment adviser"

4  because he did not receive any compensation as the investment adviser to MNT.  Docket No.132

5  at 1-7.  Murray's argument fails as a matter of law because the "for compensation" element of the

6  Advisers Act can be satisfied by mere entitlement to compensation; actual receipt of money is not

7  required.  *SEC v. fife*, 311 F.3d 1, 11 (1st Cir. 2002) ("[A]lthough Fife has not yet received

8  compensation, he understood that he would be compensated for his efforts by a commission based

9  on a percentage of the profits from the investments, *if successful,* pursuant to a formula to be

10 agreed upon at a later time. Therefore, the district court did not err in holding that the SEC set

11 forth a substantial likelihood of success against Fife under the Investment Advisers Act."); *SEC v.*

12 *Eldridge*, 2007 U.S. Dist. LEXIS 102832, at *32 (N.D. Ga. Mar. 20, 2007) (finding that there is no

13 genuine issue of material fact that the defendant was an investment adviser because, among others,

14 it "was to receive compensation for its services rendered as an investment adviser, pursuant to the

15 Trust Management Agreements).

16      Thus, all of the required elements of the Commission's Advisers Act claim have been

17 necessarily decided against Murray at the criminal trial.

18 B.    Relief

19      The Commission's Complaint seeks three forms of relief: an injunction against future

20 violations of the applicable securities laws by Murray; an order directing Murray to disgorge his

21 ill-gotten gains, with prejudgment interest; and an order directing Murray to pay a civil monetary

22 penalty for his fraud.  Docket No. 112 at 17-21.

23      1.    Permanent Injunction

24      The Commission requests that the Court permanently enjoin Murray from committing

25 future violations.  Docket No. 122 (Plaintiff's motion for summary judgment) at 17-18.

26      The federal securities laws allow courts to grant a permanent injunction against acts or

27 practices that violate the securities laws.  *See* 15 U.S.C. § 77t(b) (Securities Act); 15 U.S.C. §

28 78u(d)(1) (Exchange Act); 15 U.S.C. § 80b-9(d) (Advisers Act).  Indeed, injunctions are "the

primary civil remedy available to the SEC" for securities violations. *SEC v. Randolph*, 736 F.2d 525, 529 (9th Cir. 1984).

However, in order to obtain a permanent injunction, the Commission has to bear "the burden of showing there was a reasonable likelihood of future violations of the securities law." *SEC v. Murphy*, 626 F.2d 633, 655 (9th Cir. 1980). In predicting the likelihood of future violations, courts must assess "the totality of the circumstances surrounding the defendant and his violations," including: (1) the degree of scienter involved; (2) the isolated or recurrent nature of the infraction; (3) the defendant's recognition of the wrongful nature of his conduct; (4) the likelihood, because of defendant's professional occupation, that future violations might occur; (5) and the sincerity of his assurances against future violations. *Id.*

The Commission argues that each of these factors applies with force because: first, the jury necessarily found that Murray's actions demonstrated an intent to defraud; second, Murray's crimes recurred multiple times against multiple investors between 2009 and 2013, and Murray was previously suspended by the New York Stock Exchange for improper conduct; third, Murray's 22-year-long career in the securities industry and the record of his repeated violations suggests that Murray would engage in similar conduct; and, finally, Murray has provided no assurances against future violations. Docket No. 122 (Plaintiff's motion for summary judgment) at 17-18. Murray's sentence reflects in part Murray refusal to accept responsibility and the need to deter future violations by him.

The Court agrees with the Commission and finds that the Commission satisfied the burden of showing that there is a reasonable likelihood of future violations of the securities law by Murray.

### 2.     Disgorgement

The Commission seeks disgorgement of $2,519,114.47 that "Murray fraudulently raised from various investors in the fund between 2009 and 2012. Docket No. 122 (Plaintiff's motion for summary judgment) at 18-20.

"Disgorgement is designed to deprive a wrongdoer of unjust enrichment, and to deter others from violating securities laws by making violations unprofitable." *First Pac. Bancorp,* 142

*United States District Court*
For the Northern District of California

F.3d at 1191 (citing *Hateley v. SEC*, 8 F.3d 653, 655 (9th Cir.1993)).  District courts have broad

equity powers to order the disgorgement of "ill-gotten gains" obtained through the violation of

federal securities laws.  142 F.3d at 1191; *see also SEC v. Colello*, 139 F.3d 674, 679 (9th

Cir.1998) ("To order disgorgement, the district court . . . need find only that [the defendant] has no

right to retain the funds illegally taken from the victims.").  District courts also have broad

discretion in calculating the amount to be disgorged.  *See, e.g., SEC v. First Jersey Sec., Inc.,*101

F.3d 1450, 1474-75 (2d Cir.1996).

The Ninth Circuit has yet to opine on "whether restitution and disgorgement are really just

about the same thing."  *SEC v. First Pacific Bancorp*, 142 F.3d 1186, 1192-93 (9th Cir. 2010).

However, courts in this Circuit have offset the amount of restitution against the amount of

disgorgement.  *Commodity Futures Trading Com'n v. White Pine Trust Corp.*, 2007 WL 1754819,

at *9 (S.D. Cal. 2007) (reducing the disgorgement obligation by the amount of restitution); *U.S.

Commodity Futures Trading Comm'n v. Safevest, LLC*, 2009 WL 2448116 (C.D. Cal. 2009)

(ordering that the disgorgement obligation be reduced by the amount of the restitution obligation

because the disgorgement obligation represented the benefits received by defendants, which came

from deposits made by customers); *see also S.E.C. v. Pace*, 173 F. Supp. 2d 30, 34 (D.D.C. 2001)

("Disgorgement would be redundant with the restitution [Defendant] Pace will be required to pay

as a consequence of his criminal conviction and will not be ordered." (internal citation omitted)).

Here, the Commission's disgorgement request only concerns the funds that Murray

received from investors, and these funds were the subject of the restitution order in the related

criminal case, Docket No. 125 Ex. W.  Thus, the requested disgorgement amount of $2,519,114.47

should be entirely offset by the restitution obligation of $3,480,379.90, *id.*

The Commission also seeks $31,162.87 in prejudgment interest.  Docket No. 122

(Plaintiff's motion for summary judgment) at 19-20.  However, this amount has already been

taken into account when the Court ordered restitution of $3,480,379.90.  Thus, the requested

interest of $31,162.87 should be entirely offset by the restitution obligation.  Accordingly, no

disgorgement order is warranted in this civil enforcement action.

By denying the Commission's disgorgement request in this motion, the Court does not

United States District Court
For the Northern District of California

1    preclude the Commission from later arguing that Murray's stock trading proceeds of

2    approximately $363,000 should be subject to disgorgement.

3              3.       Civil Money Penalty

4         The Commission requests that the Court impose "third tier" civil penalties for Murray's

5    fraud.  Docket No. 134 (Plaintiff's motion for summary judgment) at 20-21.

6         The securities laws authorize courts to impose civil monetary penalties against violators

7    and establish the following three tiers of penalties, to be determined in light of the facts and

8    circumstances of each case.  *See* 15 U.S.C. § 77t(d)(2) (Securities Act); 15 U.S.C. § 78u(d)(3)

9    (Exchange Act); 15 U.S.C. § 80b-9(e) (Advisers Act).

10             1.      For each violation, the amount of penalty shall not exceed
         the greater of (i) $5,000 for a natural person or (ii) the gross amount
11        of pecuniary gain to such defendant as a result of the violation.

12             2.      The amount of penalty for each such violation shall not
         exceed the greater of (i) $50,000 for a natural person or $250,000
13        for any other person, or (ii) the gross amount of pecuniary gain to
         such defendant as a result of the violation.
14
               3.      The amount of penalty for each such violation shall not
15        exceed the greater of (i) $100,000 for a natural person or $500,000
         for any other person, or (ii) the gross amount of pecuniary gain to
16        such defendant as a result of the violation.

17        Third tier penalties, which are the most severe of the civil penalties, are available when

18   securities law violations (1) involve "fraud, deceit, manipulation, or reckless disregard for a

19   regulatory requirement" and (2) "directly or indirectly resulted in substantial losses or created a

20   significant risk of substantial losses to other persons."  *Id.*  Adjusting for inflation, the Court may

21   impose third tier penalties of up to $150,000 per violation for a natural person, or the "gross

22   amount of pecuniary gain" per violation.  *Id.*; 17 C.F.R. § 201.1004 (2009); *Bloomfield v. U.S.*

23   *S.E.C.*, 649 F. App'x 546, 550 (9th Cir. 2016).

24        A third tier civil penalty are appropriate.  The Court has already found that Murray

25   engaged in fraud or deceit by convicting him of wire fraud, money laundering, identity theft, and

26   criminal contempt in the criminal case.  Docket No. 125, Ex. U.  He did so through an elaborate

27   and prolonged scheme. He engaged in a deliberate widespread  scheme to deceive and defraud

28   numerous victims.  The Court has also found that Murray caused losses of $3.4 million and

ordered restitution of that amount.  Docket No. 125, Ex. W.  The loss of $3.4 million is substantial.  *Cf. SEC v. Alexander*, 115 F.Supp.3d 1071 (N.D. Cal. 2015).  The court in *Alexander* imposed third tier penalties of $150,000 for each count against Defendant Swanson because it found that his fraudulent actions resulted in a significant risk of substantial loss to dozens of investors, based on the judgment finding Swanson liable for $2.8 million in restitution to investors.  As in *Alexander*, Murray's fraudulent actions resulted in substantial loss.

Additionally, the Ninth Circuit has articulated five factors to consider in determining the amount of civil penalties: (1) the degree of scienter involved; (2) the isolated or recurrent nature of the infraction; (3) the defendant's recognition of the wrongful nature of his conduct; (4) the likelihood, because of the defendant's professional occupation, that future violations might occur; and (5) the sincerity of the defendant's assurances against future violations.  *S.E.C. v. Murphy*, 626 F.2d 633, 655 (9th Cir.1980).  This is the same test as the one used above to predict the likelihood of future violations.  *See S.E.C. v. Wilde*, No. SACV 11-0315 DOC, 2012 WL 6621747, at *16 (C.D. Cal. Dec. 17, 2012), *aff'd sub nom. United States Sec. & Exch. Comm'n v. Wilde*, No. 13-55043, 2016 WL 5682717 (9th Cir. Oct. 3, 2016); *Sec. & Exch. Comm'n v. CMKM Diamonds, Inc.*, 635 F. Supp. 2d 1185, 1193 (D. Nev. 2009) ("The *Murphy* factors confirm the propriety of this [civil penalty] calculation.").  Given the results and findings leading to the conviction and sentence imposed by this court discussed above, substantial civil penalties such as third tier penalties are warranted.

The Court has discretion over the specific amount of third tier penalties.  *See SEC v. Pattison,* No. C–08–4238 EMC, 2011 WL 723600, at *5 (N.D. Cal. Feb. 23, 2011), *aff'd*, 495 Fed. Appx. 786 (9th Cir.2012).  In light of the nature of Murray's conduct, it is reasonable to impose the maximum amount of $150,000 "[f]or each violation," 15 U.S.C. § 77t(d)(2); 15 U.S.C. § 78u(d)(3); 15 U.S.C. § 80b-9(e).  However, none of the Securities Act, Exchange Act, or Advisers Act defines the phrase "[f]or each violation."  *See S.E.C. v. Smith*, 2015 WL 5793999, at *2 (D.N.H. Oct. 1, 2015).  Prior courts have multiplied the per-violation penalties by "(1) the number of schemes in which the defendant was involved, (2) each violation of a statutory provision, or (3) the number of victims."  *Id.* (citation omitted).  This Court multiplies $150,000 by the number of

14

schemes in which Murray was involved.  *See S.E.C. v. Stanard*, 2009 WL 196023, at *35 (S.D.N.Y. 2009) ("While there were technically multiple violations of various provisions of the securities laws, all of them resulted from a single scheme. Accordingly, the Court concludes that a total penalty of $100,000 is appropriately imposed for defendant's violations."); *United States Sec. & Exch. Comm'n v. Garfield Taylor, Inc.*, 134 F. Supp. 3d 107, 110 (D.D.C. 2015) ("[T]he Commission asserted that courts have considered each victim of a scheme to constitute a separate violation, but did not offer specific support for that proposition. While the Court has found some support for the position, other courts have assessed only a single penalty where the violations arose from a single scheme or plan.").  Since Murray's conduct arguably was connected to a single (though elaborate) scheme in connection with MNT, and given the restitution order previously issue in the criminal case, the Court finds it appropriate to impose a total civil penalty of $150,000.

The Court recognizes that Murray has failed to fully satisfy his restitution obligations.  *See* Docket No. 390 (Motion for order to apply funds held by the United States Secret Service for payment of Defendant's restitution judgment) ("Defendant has not made any payments toward his restitution obligation."); Docket No. 392 (Order granting the motion).  Even if Murray's failure stemmed from his inability to pay, the Court refuses to excuse Murray from the penalties because to do so would compromise "the purposes of the securities laws."  *SEC v. Inorganic Recycling Corp.*, 2002 WL 1968341, at *4 (S.D.N.Y. 2002); *Sec. & Exch. Comm'n v. Nadel*, 2016 WL 639063, at *26 (E.D.N.Y. 2016).  The civil penalty of $150,000 is consistent with the dual goal of civil penalties to punish individual violators and deter future violations. *See SEC v. eCoonect*, 2002 WL 34465925, at *5 (C.D. Cal. 2002); *SEC v. Moran*, 944 F. Supp. 286, 296 (S.D.N.Y. 1996).

### III.   CONCLUSION

For the reasons stated above, the Court **GRANTS in PART and DENIES in PART** Plaintiff's motion for summary judgment.

The Court orders as follows:

1.      Plaintiffs' motion for summary judgment with respect to the Section 17(a), Section

United States District Court
For the Northern District of California

10(b), Rule 10b-5 claims is **GRANTED**.

    2.      Plaintiffs' motion for summary judgment with respect to the Section 206(4) claim is **GRANTED**.

    3.      Plaintiffs' request for permanent injunction to enjoin Murray from further violating the securities laws is **GRANTED**.

    4.      Plaintiffs' request for disgorgement and prejudgment interest is **DENIED**.

    5.      Plaintiffs' request for civil penalties is **GRANTED** in the amount of $150,000.

This order disposes of Docket No. 122.

    **IT IS SO ORDERED**.

Dated: November 23, 2016

_____
EDWARD M. CHEN
United States District Judge